UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ALYSHA C.,[1]

|  |  |  |
|---|---|---|
| | Plaintiff, | Case # 20-CV-1178-FPG |
| v. | | DECISION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | | |
| | Defendant. | |

## INTRODUCTION

Plaintiff Alysha C. brings this action pursuant to the Social Security Act seeking review of the final decision of the Commissioner of Social Security that denied her application for Supplemental Security Income ("SSI") under Title XVI of the Act.  ECF No. 1.  The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c)(3).  Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  ECF Nos. 16, 18. For the reasons that follow, the Commissioner's motion is GRANTED, Plaintiff's motion is DENIED, and the complaint is DISMISSED WITH PREJUDICE.

## BACKGROUND

In September 2017, Plaintiff applied for SSI with the Social Security Administration ("the SSA").  Tr.[2] 189.  She alleged disability since November 2015 due to, among other things, postural orthostatic tachycardia syndrome ("POTS"),[3] chronic fatigue syndrome, migraines, fainting, and

---

[1] Under this District's Standing Order, any non-government party must be referenced solely by first name and last initial.

[2] "Tr." refers to the administrative record in this matter.  ECF No. 13.

[3] POTS "is a condition that affects the circulation of blood, which is associated with the development of symptoms that occur when standing up from a reclining position and that may be relieved by sitting or lying back down.  The primary symptom of POTS is lightheadedness, fainting, and un uncomfortable, rapid increase in heartbeat, as well as

insomnia.  Tr. 153, 190.  In September 2019, Administrative Law Judge Gregory Moldafsky ("the

ALJ") issued a decision finding that Plaintiff is not disabled.  Tr. 15-23.  In July 2020, the Appeals

Council denied Plaintiff's request for review.   Tr. 1-4.   This action seeks review of the

Commissioner's final decision.  ECF No. 1.

**LEGAL STANDARD**

## I.      District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the

SSA's conclusions were supported by substantial evidence in the record and were based on a

correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation marks

omitted); *see also* 42 U.S.C. § 405(g).  The Act holds that a decision by the Commissioner is

"conclusive" if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence

means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

(quotation marks omitted).  It is not the Court's function to "determine *de novo* whether [the

claimant] is disabled."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation marks

omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990)

(holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are

conclusive if supported by substantial evidence).

## II.     Disability Determination

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is

disabled within the meaning of the Act.  *See Parker v. City of New York*, 476 U.S. 467, 470-71

---

chest pain, exhaustion, high/low blood pressure, nausea, blurred vision, diarrhea, forgetfulness, headaches, and many others."  *Drabczyk v. Comm'r of Soc. Sec.*, No. 18-CV-355, 2020 WL 4390701, at \*2 n.4 (W.D.N.Y. July 31, 2020).

(1986).  At Step One, the ALJ must determine whether the claimant is engaged in substantial gainful work activity.  *See* 20 C.F.R. § 416.920(b).  If so, the claimant is not disabled.  If not, the ALJ proceeds to Step Two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities.  *Id.* § 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to Step Three.

At Step Three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings").  *Id.* § 416.920(d).  If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, *id.* § 416.909, the claimant is disabled.  If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments.  *See id.* § 416.920(e)-(f).

The ALJ then proceeds to Step Four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work.  *Id.* § 416.920(f).  If the claimant can perform such requirements, then he or she is not disabled.  *Id.*  If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled.  *Id.* § 416.920(g).  To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience.  *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 416.960(c).

## DISCUSSION

### I.    The ALJ's Decision

The ALJ analyzed Plaintiff's claim for benefits under the process described above.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 2017, her application date.  Tr. 17.  At step two, the ALJ found that Plaintiff had severe impairments of POTS and gastroparesis.  *Id.*  At step three, the ALJ found that these impairments did not meet or medically equal any Listings impairment.  Tr. 18.

Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work with additional limitations.  *Id.*  At step four, the ALJ found that Plaintiff had no past relevant work. Tr. 21.  At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  Tr. 22-23.  The ALJ therefore found that Plaintiff was not disabled.  Tr. 23.

### II.   Analysis

Plaintiff argues that remand is warranted because (1) the ALJ failed "to consider her limitations from fatigue or her need to lie down when she experienced presyncopal episodes" due to POTS, ECF No. 16-1 at 19; (2) the ALJ erroneously analyzed a restriction identified by her treating cardiologist, Joseph D. Orie, M.D., *id.* at 21; and (3) the ALJ failed to properly consider her rate of absenteeism.  *Id.* at 23-25.

#### a.  Plaintiff's Fatigue and Need to Lie Down

At the September 3, 2019 hearing, Plaintiff testified that she was diagnosed with POTS in 2010 and that her symptoms have fluctuated "randomly" over that period.  Tr. 156, 173.  Plaintiff testified that her POTS causes her blood pressure to "drop" unpredictably, which leads to unforeseeable episodes of fainting, lightheadedness, and dizziness.  Tr. 155-56.  In turn, these

symptoms cause Plaintiff chronic fatigue and migraines. Tr. 156. To avoid bouts of tachycardia or passing out, Plaintiff must routinely lie down or sit in a reclined position. Tr. 156, 158. Plaintiff stated that she has difficulty transitioning from one position to another—sitting to standing, bending over to getting back up, etc. Tr. 158. Even while remaining in a seated position, Plaintiff will become "dizzy and nauseous" over time, requiring her to recline. *Id.* Plaintiff estimated that, three to four times per week, she has "sudden and severe" episodes of fainting or dizziness— during which she needs to lay down for "a couple of hours"—and that, every day, she has more mild, "coming and going" symptoms that necessitate a 15-to-20 minute recline. Tr. 159. Because of her chronic fatigue, Plaintiff sleeps for 9 ½ to 10 hours each night and takes a two-hour nap "on most days." Tr. 161. Depending on her level of fatigue, she can have "brain fog" that impedes her concentration and memory. Tr. 175, 176.

Plaintiff testified that these symptoms significantly interfered with her ability to function. Plaintiff cannot walk at a slow pace for ten minutes without needing to lie down. Tr. 169-70. Plaintiff only drives a car once or twice per week and is limited to driving on those roads where she can easily pull over. Tr. 155. Plaintiff stated that she was prescribed a wheelchair, due to her inability to walk more than ten minutes "without getting [] tachycardic episodes," though she clarified that she used the wheelchair on an as-needed basis. Tr. 166. Plaintiff was unable to sustain full-time employment as a teacher assistant, nor as a part-time preschool teacher, nor as a two-day-per-week nanny. Tr. 157. Plaintiff's fatigue prevented her from being able to maintain these jobs. *Id.*

The medical records concerning Plaintiff's POTS and fatigue are mixed. There are treatment notes that reflect the kinds of complaints Plaintiff identified at the hearing. In 2016, she reported sleeping for nine hours each night and napping two hours each day, Tr. 424, and she stated

that she could walk for only thirty minutes at a time before becoming "too tired." *id.* At appointments in early to mid-2017, Plaintiff reported worsening symptoms and ongoing fatigue, lightheadedness, nausea, and an inability to exercise. Tr. 393, 396. During the latter part of 2017, Plaintiff also complained that she would feel like passing out if she did not "move[] around" every five minutes, Tr. 434, that she cannot perform a job "where she wuld [sic] move around a lot" due to her fatigue, *id.*, that she was "having a difficult time functioning" due to POTS, Tr. 585, and that she suffered from "brain fog" due to POTS, Tr. 446. By December 2017, Plaintiff was reporting that her symptoms were "considerably worse," with "more episodes of near syncope" and an inability to walk "for any distance." Tr. 777. Plaintiff reported similar complaints on occasion in 2018 and 2019. *See* Tr. 616, 625, 697, 739, 761, 771.

At other times during the period between 2016 and 2019, however, Plaintiff disclosed higher functional abilities than her testimony or the above notes would suggest. Plaintiff reported fainting episodes only rarely. *See* Tr. 652 (in May 2018, reporting that she had not "passed out" in "about 2 years or so"); *see also* Tr. 393, 396, 774. In June 2017, she noted that she had babysat her niece and was "very active" with her. Tr. 549. After she began physical therapy, Plaintiff indicated that she was able to tolerate more physical activity: in July 2018, she was increasing her outdoor activities, Tr. 682; in August 2018, she visited "Darien Lake [amusement park] for 4 days" without a wheelchair, Tr. 689; in November 2018, she was "increasing her amount of time working" and was "happy with how she feels," Tr. 731; in January 2019, she was trying to "use the treadmill 2-3 times a week" and was "currently working 3 times a week until about 2pm," Tr. 739; in February 2019, she stated she "feels stronger" and was able to work "a few long days during the week babysitting," Tr. 747; and in March 2019, she noted that she did not have to use a wheelchair "for the winter season." Tr. 754. On occasion, Plaintiff indicated that her treatment

regimen helped to alleviate her symptoms.  *See* Tr. 420 (in August 2016, stating that "florinef" medication "significantly helper her POTS"); Tr. 769 (in May 2019, reporting that, after taking supplements, she felt "great" and had not had as much energy "in years").  This is especially so with physical therapy.  *See* Tr. 667; Tr. 689 (in August 2018, reporting she was "pleased with herself" and had "increased activity"); Tr. 747, Tr. 754 (in March 2019, stating she has felt better than she has "in years").

Furthermore, medical providers have generally suggested no more than conservative treatment, despite Plaintiff's sometimes grave complaints.   Dr. Orie, Plaintiff's treating cardiologist, repeatedly emphasized that "conservative" measures—like more fluid and salt intake, and carefully changing positions—could be used to manage Plaintiff's POTS.  Tr. 508, 510, 512. Dr. Orie never placed any "formal restrictions" on Plaintiff's physical activity or exercise, except that she should not "climb high altitudes, swim, ski, etc. without a partner."  Tr. 510, 512.  Indeed, in a functional capacity assessment dated April 2018, Dr. Orie opined that Plaintiff had no limitations in the areas of sitting, standing, walking, lifting, carrying, pushing, or pulling.  Tr. 513. Likewise, even in the face of Plaintiff's serious complaints, other medical providers suggested fairly conservative measures.  *See* Tr. 393-95 (noting that sleep studies "were essentially normal" and indicated "mild daytime sleepiness"; declining to recommend "pharmacotherapy for her daytime fatigue"; and counseling Plaintiff "on sleep hygiene practices"); Tr. 436-37 (suggesting that Plaintiff engage in 20 minutes of aerobic exercise four times per week); Tr. 492 (same); Tr. 773 (recommending that Plaintiff add vitamins to diet and avoid stimulants).

In his decision, the ALJ noted that Plaintiff alleged, in addition to POTS, that she suffered from chronic fatigue syndrome.  Tr. 18.  Relying on Social Security Ruling 14-1p, the ALJ found that Plaintiff's alleged chronic fatigue syndrome was a "non-medically determinable impairment."

*Id.* The ALJ observed that, rather than evidencing chronic fatigue *syndrome*, the record showed that Plaintiff was complaining of "fatigue and fainting" resulting from her POTS. *Id.* As to her POTS, the ALJ concluded that it had been "successfully [] treated with conservative measures and medical therapy." Tr. 20.

As Plaintiff reads the ALJ's decision, the ALJ considered Plaintiff's complaints of fatigue only in the context of step two—that is, when he concluded that Plaintiff's alleged chronic fatigue *syndrome* was not a medically determinable impairment. *See* ECF No. 16-1 at 20. Plaintiff asserts that the ALJ failed to consider whether and how her *symptom* of fatigue due to POTS when he crafted the RFC. *Id.* Similarly, Plaintiff contends that the ALJ failed to consider her "need to lie down during presyncopal episodes." *Id.* at 21. The Court is not persuaded.

As a general matter, the ALJ "is not required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered." *Golibersuch v. Comm'r of Soc. Sec.*, No. 18-CV-976, 2020 WL 409991, at *4 (W.D.N.Y. Jan. 24, 2020). In this case, while the ALJ's decision is not a model of clarity, it is sufficient to allow the Court to discern that the ALJ did, in fact, consider Plaintiff's complaints of fatigue and need to lie down as they related to her POTS. *See id.* ("[A]n ALJ's failure to fully express her reasoning does not justify remand so long as the Court can glean the rationale of the decision."). The ALJ expressly acknowledged that Plaintiff complained of "fatigue and fainting" and cited records detailing those symptoms as they related to Plaintiff's POTS. *See* Tr. 18, 395, 400, 697. While the ALJ's discussion was located in the section on step two of the analysis, Tr. 18, the ALJ also discussed Plaintiff's fatigue, presyncopal episodes, and need to lie down in the RFC section. *See* Tr. 19 (summarizing Plaintiff's hearing testimony regarding POTS, fatigue, and need to lie down); Tr. 20 (discussing evidence related to POTS); Tr. 21 (analyzing Dr. Orie's opinion). Accordingly, the

Court cannot conclude that the ALJ ignored or otherwise failed to consider these symptoms when he fashioned the RFC.

Of course, there are the separate questions of whether the ALJ's consideration of these symptoms was reasonable, and also whether the ALJ's ultimate conclusions as to the RFC were supported by substantial evidence. To the extent Plaintiff also finds the ALJ's decision erroneous in those respects, she has not convinced the Court that remand is warranted.

As to Plaintiff's fatigue, Plaintiff cites various treatment notes to show that she has routinely complained about fatigue in ways consistent with her hearing testimony. *See* ECF No. 16-1 at 20. Plaintiff also describes her POTS as one in which her symptoms were erratic and cyclic: she reported improvements at times but then suffered from setbacks due to "persistent fatigue." *Id.*

At most, however, the evidence Plaintiff cites demonstrates there was "a conflict in the record, one which the ALJ was entitled to resolve." *Lynette W. v. Comm'r of Soc. Sec.*, No. 19-CV-1168, 2021 WL 868625, at *4 (W.D.N.Y. Mar. 9, 2021); *Gogos v. Comm'r of Soc. Sec.*, No. 18-CV-1188, 2020 WL 128445, at *3 (W.D.N.Y. Jan. 10, 2020) ("It is the ALJ's job to resolve conflicting record evidence and the Court must defer to that resolution."). There is indeed evidence that would support Plaintiff's allegations of severe, debilitating fatigue, along with a need to lie down regularly to avoid fainting. *See* ECF No. 16-1 at 20 (citing record evidence). But there is also abundant contrary evidence that casts doubt on Plaintiff's allegations. As the ALJ noted in the decision, and as the Court discussed above, the record discloses that these symptoms improved with physical therapy. *See* Tr. 18; *see, e.g.*, Tr. 667, 689, 747. Plaintiff also reported significant improvement after beginning to take supplements, Tr. 769, and, on occasion, some improvement through medication changes, Tr. 771. More importantly, despite the serious complaints Plaintiff

alleged during the relevant period, medical providers continued to recommend conservative treatment protocols, sometimes in light of the normal objective findings. *See, e.g.*, Tr. 393-95 (noting normal sleep studies and declining to recommend pharmacotherapy for daytime fatigue); Tr. 510 (noting Plaintiff's normal blood pressure in different positions and recommending conservative treatment and no physical limitations); *see also* Tr. 508, 512, 773.  The ALJ cited these factors as important to his analysis.  *See* Tr. 21 (noting that objective findings and conservative treatment cast doubt on Plaintiff's claims of "severe" "work related limitations").

Given this record, the ALJ reasonably rejected Plaintiff's allegations of debilitating, cyclical functional limitations due to her fatigue and need to lie down.  And because "the ALJ's finding in this respect is reasonably supported by the record, it must be given conclusive effect even if the administrative record may also adequately support contrary findings on particular issues." *Tasha S v. Comm'r of Soc. Sec.*, No. 20-CV-421, 2021 WL 3367588, at *5 (W.D.N.Y. Aug. 3, 2021) (internal quotation marks omitted).

Accordingly, remand is not warranted based on these arguments.

### b.  Dr. Orie's Opinion

Plaintiff next argues that the ALJ improperly relied on his own lay opinion to craft restrictions related to Plaintiff's symptom of dizziness.  In his functional capacity assessment, Dr. Orie opined that Plaintiff suffered from no functional limitations except one: she needed to lie down or recline "as needed" due to "dizziness."  Tr. 513.  The ALJ rejected this restriction as unpersuasive, stating that the "record shows [Plaintiff] can only squat 2/3rds before feeling dizzy." Tr. 21.  Instead, the ALJ "accounted for [Plaintiff's] symptom of dizziness by limiting her to occasional stopping [sic], balancing, kneeling, and couching [sic]." *Id.*  Plaintiff asserts that the ALJ's rationale was erroneous, because "[n]othing in her treatment records indicates Plaintiff

could perform any of these activities occasionally . . . or that doing so would allow her to avoid lying down when she felt like she was going to pass out." ECF No. 16-1 at 21. Consequently, in Plaintiff's view, the ALJ engaged in "improper substitution of [his] lay opinion for that of a medical expert." *Id.*

The Court cannot agree that the ALJ's findings concerning stooping, balancing, kneeling, crouching, and crawling were the result of improper lay opinion. To the contrary, those restrictions are supported by the medical opinion of state agency consultant B. Stouter, M.D., who opined in December 2017 that Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl.[4] Tr. 196-97. Therefore, the premise of Plaintiff's argument is incorrect; the ALJ did not rely on his own lay opinion to reject Dr. Orie's dizziness limitation or craft these RFC restrictions.

To be sure, in his decision, the ALJ stated that he found Dr. Stouter's opinion "*not persuasive*," given that examination findings revealed that Plaintiff has "moderate physical limitations [that] limit [her] ability to stoop and crawl." Tr. 21 (emphasis added). While this language would suggest that the ALJ did not rely on Dr. Stouter's opinion, to the Court it is evident that this is a typographical mistake. Because the ALJ essentially adopted Dr. Stouter's findings with respect to those functional areas, it cannot be that he found those findings unpersuasive. *See, e.g.*, *Whitley v. Comm'r of Soc. Sec.*, No. 17-CV-6664, 2019 WL 2117667, at *2-3 (W.D.N.Y. May 15, 2019) (finding that ALJ had made "typographical mistake[]" in writing that psychologist's opinion deserved "little weight," where it was "apparent" from decision as a whole that the "the ALJ intended to afford the [] psychologist's opinion greater than limited weight").

---

[4] In these functional areas, the only difference between Dr. Stouter's opinion and the ALJ's RFC is that the ALJ limited Plaintiff more strictly by finding that she should "never crawl." Tr. 18. Plaintiff does not argue that the ALJ's more restrictive finding on crawling constitutes a harmful error justifying remand. Nor, more generally, does Plaintiff argue that the ALJ erred by relying on Dr. Stouter's opinion.

Remand is not warranted on this basis.[5]

### c. Absenteeism

Finally, Plaintiff argues that the ALJ failed to consider that Plaintiff's need to "attend regular physical therapy" would cause excessive absences and, therefore, render her unemployable. ECF No. 16-1 at 24. To make this argument, Plaintiff attempts to extrapolate from her prior record of physical therapy and other medical appointments to show that she would suffer from excessive absenteeism. *See id.* The Court finds this "extrapolation" unconvincing. *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000). As an initial matter, Plaintiff's argument presumes that the frequency of her appointments would remain constant over time. But the purpose of physical therapy was to rehabilitate and treat Plaintiff's "general deconditioning" and muscle weakness, Tr. 623-25, with the goal of building up Plaintiff's strength and endurance. Tr. 628. Thus, the presumption would be that Plaintiff's need for, and the frequency of, physical therapy would diminish over time, not remain constant.[6]

In any case, the record shows that Plaintiff's physical therapy appointments lasted between twenty-five to forty minutes. *See* Tr. 668, 705, 732, 740, 755. Plaintiff cites no evidence in the record to demonstrate that "she would need to miss an entire day of work" for each appointment or that her "appointments could not have been scheduled differently" so as to prevent excessive absenteeism. *Cavalieri v. Comm'r of Soc. Sec.*, No. 17-CV-812, 2019 WL 2710110, at *4

---

[5] In her brief, Plaintiff also writes, "In dismissing Dr. Orie's opinion that Plaintiff needed to recline when she became dizzy, the ALJ also failed to adequately consider its supportability, credibility, or consistency with the record as a whole." ECF No. 16-1 at 21. She cites two cases but does not elaborate on this point any further. Absent more developed argument, the Court will not address this argument. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly." (internal quotation marks omitted)).

[6] Indeed, in September 2017, Dr. Orie apparently told Plaintiff that she would "outgrow" her POTS over time. Tr. 574.

(W.D.N.Y. June 28, 2019).  Given the lack of evidence in the record to that effect, remand is

unwarranted.  *Accord Barnett*, 231 F.3d at 691.

## CONCLUSION

For all of the reasons stated, the Commissioner's Motion for Judgment on the Pleadings

(ECF No. 18) is GRANTED, and Plaintiff's Motion for Judgment on the Pleadings (ECF No. 16)

is DENIED.  The complaint is DISMISSED WITH PREJUDICE, and the Clerk of Court is directed

to enter judgment and close this case.

IT IS SO ORDERED.

Dated: February 15, 2022
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York